UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | * | CRIMINAL NO.: 18-160 |
| v. | * | SECTION: "J" |
| TERRY J. KNOPE, II | * | |
| | * * * | |

## FACTUAL BASIS

The defendant, **TERRY J. KNOPE, II** ("**KNOPE**"), agrees to plead guilty to Counts One, Two, Three, and Four of the Superseding Bill of Information. Count One charges the defendant with Conspiracy, in violation of Title 18, United States Code, Section 371, for conspiring with members of his family to commit a violation of Title 18, United States Code, Section 1589 (Forced Labor). Count Two charges the defendant with Interference with Housing Rights, in violation of Title 42, United States Code, Section 3631. Count Three charges the defendant with a Hate Crime, in violation of Title 18, United States Code, Section 249(a)(2). Count Four charges the defendant with Misprision of a Felony, in violation of Title 18, United States Code, Section 4. The defendant agrees that, if this matter were to go to trial, the government would prove the following facts beyond a reasonable doubt, and the defendant also agrees that the following facts are true and occurred within the Eastern District of Louisiana between on or about August 13, 2015 and June 30, 2016:

1.   In 2015, **KNOPE** lived with his wife, R.K., his step-daughter, B.L., his step-son, J.L., and his daughter, T.K., along with other family members (collectively, "the family"). Until

late August 2015, the family lived together in a home in Kentwood, Louisiana ("the Kentwood home"). In August 2015, **KNOPE**, R.K., J.L., and T.K. moved to a property containing a mobile home on Rushing Lane in Amite, Louisiana ("the Rushing Lane property"). B.L. did not live at the Rushing Lane property full-time, but, starting in August 2015, B.L. was regularly present at the property and lived there periodically.

2. D.P. is a relative of R.K.'s. In 2015, D.P. and her mother came to live with the family in the Kentwood home. D.P. has been diagnosed with disabilities, including autism, and is handicapped as that term is defined in 42 U.S.C. § 3602(h). Based on this diagnosis, D.P. received a government disability check (Supplemental Security Income or SSI benefits) from the U.S. Social Security Administration each month to pay for her living expenses. D.P.'s mother died on August 12, 2015. Shortly afterward, D.P. moved with **KNOPE**, R.K., J.L., and T.K. to the Rushing Lane property because D.P. had nowhere else to go. Also, shortly after D.P.'s mother died, **KNOPE** completed paperwork to become D.P.'s representative payee, which meant that he started receiving D.P.'s monthly government disability check on D.P.'s behalf.

3. Throughout the time D.P. and the family lived at the Rushing Lane Property, **KNOPE**, R.K., J.L., B.L., and T.K. collectively subjected D.P. to consistent physical violence, threats of physical violence, physical restraint, threats of physical restraint, psychological and verbal abuse, abuse of legal process, and psychological manipulation in order to obtain uncompensated household labor and services from D.P. **KNOPE** was aware of this plan among his family members, knowingly agreed to participate in it, and engaged in acts both on his own and with other members of his family that advanced the plan's objective.

4. Initially, at the Rushing Lane property, D.P. was permitted to sleep inside the

family's mobile home. However, as part of the family's plan to obtain uncompensated household labor and services from D.P., the family physically restrained D.P. for several months in 2015 and 2016 in order to maintain control over her and to prevent her from escaping. After a few days of living inside the mobile home, D.P. was required to sleep in a camping tent in the backyard. At R.K.'s direction, the family locked D.P. inside the tent at night with a small padlock that fastened the tent's zipper shut.

5. At some point while D.P. was living in the locked tent, the family installed portable sheds on the Rushing Lane property. **KNOPE** and R.K. ordered D.P. to live in one of these sheds. The shed did not have running water or electricity. The family gave D.P. a five-gallon bucket to use as a toilet while she was inside the shed. At night, at **KNOPE's** and R.K.'s direction, the family closed the door to the shed with a latch from the outside so that D.P. could not get out of the shed. After a time, at **KNOPE's** and R.K.'s direction, the family also locked the shed from the outside by threading a small padlock through the closed latch.

6. After D.P. lived in the shed for a time, **KNOPE** became angry with D.P. for spilling water on the shed's floor, causing the floor to rot. At **KNOPE's** and R.K.'s direction, D.P. was again required to live in a locked tent in the backyard. This time, the tent was placed under an open wooden structure.

7. One day, several months prior to June 30, 2016, and during the time D.P. was living in the locked tent under the open wooden structure, **KNOPE** and R.K. discussed where to house D.P. at the Rushing Lane property. During this discussion, **KNOPE** and R.K. agreed that they would move D.P.'s tent into a locked backyard cage and force D.P. to live in a cage that was already located in the backyard and had previously been used to house animals.

8. Immediately after **KNOPE** and R.K. reached this decision, the family started preparing the cage for D.P. As part of this task, J.L., T.K. and other family members gathered branches and a tarp to put over the cage as camouflage. Once the cage was ready, **KNOPE** and R.K. then ordered D.P. into the cage. D.P. complied, and R.K. locked the cage with a metal chain and padlock.

9. At **KNOPE's** and R.K.'s direction, D.P. was forced to live in the cage for several months prior to June 30, 2016. Usually, T.K. locked D.P. into the cage at night and unlocked the cage in the morning. The cage did not have running water or electricity at any point in time. While inside, D.P. used a five-gallon bucket as a toilet.

10. The purpose and effect of the physical restraint described in paragraphs 4 through 9, above, was to prevent D.P. from escaping from the Rushing Lane property and to scare D.P. into continued compliance with the family's orders, including, among other things, housework and yard work. Throughout the time D.P. lived at the Rushing Lane property, **KNOPE** and other members of his family required D.P. to complete housework and yard work in exchange for food and water. Each day, D.P. was required to clean up the yard. At various times, at R.K.'s direction, D.P. was also required to clean the bathroom in the mobile home, clean the mobile home's kitchen, and wash the family's dishes, among other tasks. D.P. was not paid for any of her work. At **KNOPE's** and R.K.'s direction, D.P. was not permitted to eat the same food as the family; D.P. was required to eat food of lesser quality. Additionally, if D.P. did not complete her work to **KNOPE's** or R.K.'s liking, or if D.P. did not complete the work quickly enough, **KNOPE** and R.K. denied D.P. food. Because of this, D.P. lost a substantial amount of weight while living at the Rushing Lane property.

11. Throughout the time D.P. lived at the Rushing Lane property, if D.P. did not complete her housework or yardwork to **KNOPE's** or R.K.'s liking, D.P. would be physically assaulted. On more than one occasion, **KNOPE** choked and kicked D.P. and R.K. threw canned goods at D.P. for this reason.

12. On several occasions, **KNOPE** and members of his family forced D.P. to do housework in a demeaning fashion. Once, **KNOPE** and R.K. forced D.P. to clean the kitchen and walls with a toothbrush. On one other occasion, **KNOPE** and R.K. required D.P. to cut the grass in the yard using scissors.

13. Throughout the time D.P. lived at the Rushing Lane property, each member of the family, including **KNOPE**, physically assaulted D.P. **KNOPE** knew the physical abuse of D.P. to be routine, saw this regular physical abuse, and knew that these assaults often caused D.P. physical injuries. The purpose and effect of these physical assaults was to scare D.P. into continued compliance with the family's orders, including, among other things, housework and yard work.

14. On one occasion, after R.K. complained to B.L. that D.P. should be punished, B.L. struck D.P. over the head with a wood board. The strike caused D.P. to bleed from her head such that blood dripped onto D.P.'s shirt and onto the floor. D.P. was not provided professional medical care because the family did not want anyone to know how they were treating D.P. Instead, one of the family members used glue to close the wound.

15. On another occasion, **KNOPE** burned D.P. with a cigarette lighter by placing the flame directly on D.P.'s hand, while B.L. held D.P.'s arm in place. While being burned, D.P. cried, stated that the flame was causing her pain, and attempted to pull her arm away from the

flame, but B.L. held D.P.'s arm in place preventing D.P. from escaping the flame. As he burned D.P., **KNOPE** told D.P. that she was being punished for talking back to R.K.

16. On other occasions, R.K. directed other family members to physically assault D.P. to punish D.P.

17. Throughout the time D.P. lived at the Rushing Lane property, **KNOPE**, R.K., J.L., and B.L. threatened D.P. **KNOPE** knew the threats made to D.P. to be routine. These threats included, among other things, threats to beat D.P. if she disobeyed the family's orders, and threats to kill her if she ever reported the family to law enforcement. The purpose and effect of these threats was to scare D.P. into continued compliance with the family's orders, including, among other things, housework and yard work.

18. Throughout the time D.P. lived at the Rushing Lane property, each member of the family, including **KNOPE**, verbally and psychologically abused D.P. **KNOPE** knew the verbal and psychological abuse of D.P. to be routine. The family regularly called D.P. "stupid," and "retarded," in reference to D.P.'s disability. R.K. once said, in reference to D.P., "This retarded girl will do anything you say." On one occasion, R.K. ordered D.P. to open an urn containing D.P.'s deceased mother's ashes, pour the ashes into a bowl with milk, and eat the ashes with a spoon, while the family, including **KNOPE**, watched. On other occasions, the family forced D.P. to lick soiled underwear and eat dog feces placed on bread. In addition, **KNOPE**, R.K. and J.L. forced D.P. to simulate sexual acts with a jalapeño pepper and grab the genitals of male members in the household. The purpose and effect of this verbal and psychological abuse was to obtain D.P.'s continued compliance with the family's orders, including, among other things, housework and yard work.

19. Throughout the time D.P. lived at the Rushing Lane property, **KNOPE** and R.K. manipulated the legal process to advance the conspiracy. As an example, **KNOPE** and R.K. prevented D.P. from keeping possession of any state identification, money, or means of communication, so as to prevent D.P. from escaping their control or contacting law enforcement.

20. The conduct described in paragraphs 1 through 16, above, constituted a scheme, plan, and pattern intended to cause D.P. to believe that if she did not obey the orders given to her by **KNOPE** and **KNOPE's** family members, she would suffer serious harm and physical restraint.

21. Throughout the time D.P. and the family lived at the Rushing Lane property, **KNOPE** used force and threats of force to injure, intimidate, and interfere with D.P. because she was a handicapped person (as that term is defined in 42 U.S.C. § 3602); because she was renting and occupying a place in the family's mobile home on the Rushing Lane property; and to intimidate D.P. from participating in the rental and occupation of a dwelling without discrimination on account of her handicap. Specifically, **KNOPE** did not want D.P. to live in the family's mobile home because of her disabilities, and so despite serving as D.P.'s representative payee and receiving D.P.'s SSI benefits to pay for her living expenses, **KNOPE** forced D.P. to live in a locked backyard cage on the Rushing Lane property. **KNOPE** also acted with the purpose of intimidating D.P. from leaving the Rushing Lane property and occupying a dwelling elsewhere, where D.P. would not be abused because of her disability. **KNOPE's** actions resulted in bodily injury to D.P. and included the use, attempted use, and threatened use of dangerous weapons and fire.

22. Between on or about August 13, 2015, and through June 30, 2016, **KNOPE** shot D.P. with a BB gun at close range because of D.P.'s disability. When he shot D.P., **KNOPE** told

D.P. that she was a "retard" who "deserved to die." **KNOPE** did not have another reason for shooting D.P. other than D.P.'s disability. The BBs **KNOPE** shot at D.P. lodged in her skin and caused her bodily injury. The BB gun **KNOPE** used to shoot D.P., is a dangerous weapon, as that term is used in 18 U.S.C. § 249, was manufactured in New York State, and had traveled in interstate commerce from New York to Louisiana.

23.     Between on or about August 13, 2015, and through June 30, 3016, **KNOPE** knew J.L. and T.K. manufactured methamphetamine at the Rushing Lane property. **KNOPE** knew that this was a violation of federal law, but he did not report it to any law enforcement authority. **KNOPE** also took affirmative steps to conceal this crime. Specifically, **KNOPE** participated in a plan with R.K., J.L., and T.K. to purchase certain key ingredients used to manufacture methamphetamine in a manner that would avoid detection by law enforcement. In fact, as **KNOPE** well knew, T.K. and J.L. were using the ingredients he purchased to manufacture methamphetamine on the Rushing Lane property, and **KNOPE's** actions helped conceal that illegal activity from law enforcement.

Both the government and the defendant, **TERRY J. KNOPE, II**, do hereby stipulate and agree that the above facts are true, and that they set forth a sufficient factual basis for the crimes to which the defendant is pleading guilty.

_____ 5/20/19
JULIA K. EVANS            Date
Assistant United States Attorney


_____ 5/20/19
RISA BERKOWER            Date
NICHOLAS REDDICK
Trial Attorneys
Civil Rights Division, Criminal Section
U.S. Department of Justice

_____ 5-20-19
TERRY J. KNOPE, II       Date
Defendant

_____ 5/20/19
MICHAEL RIEHLMANN        Date
Counsel for Defendant